STATE of Wisconsin, Plaintiff-Respondent,

v.

Lisimba L. LOVE, Defendant-Appellant-Petitioner.

Supreme Court

*No. 2003AP2255. Oral argument April 27, 2005. —Decided July 12, 2005.*

2005 WI 116

(Also reported in 700 N.W.2d 62.)

111

For the defendant-appellant-petitioner there were briefs by *Kathleen S. Donius* and *Reinhart Boerner Van Deuren S.C.*, Milwaukee, and oral argument by *Kathleen S. Donius*.

For the plaintiff-respondent the cause was argued by *Michael C. Sanders,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. LOUIS B. BUTLER, JR., J. Lisimba Love seeks review of a court of appeals summary disposition[1] that affirmed the circuit court's order denying Love's postconviction motion requesting a new trial on ineffective assistance of postconviction counsel and newly discovered evidence grounds.

¶ 2. Love argues that he presented sufficient material facts for a reviewing court to meaningfully assess his claims. Further, he contends that he is entitled to an evidentiary hearing on both claims. We agree. Although Love's motion does not allege sufficient facts that, on their face, would be admissible at the hearing, the motion papers allege sufficient material objective factual assertions that, if true, entitle him to relief. Therefore, we reverse the court of appeals' decision and remand this case to the circuit court for an evidentiary hearing on both of his claims to determine whether Love is entitled to a new trial.[2]

I

¶ 3. On September 28, 1999, shortly after midnight, Glenn Robinson, a Milwaukee Bucks professional basketball player, left Junior's Sports Bar in

---

[1] *State v. Love,* No. 2003AP2255, unpublished order (Wis. Ct. App. May 12, 2004).

[2] We do not determine that Love is entitled to a new trial either because counsel was ineffective or because the defendant has presented newly discovered evidence. We merely conclude that Love has raised sufficient facts that would warrant an evidentiary hearing on each claim.

Milwaukee, Wisconsin. Fifteen or twenty feet away from the exit, he was accosted by two men and robbed. The following evidence was presented at Love's trial.

¶ 4. Robinson arrived alone at Junior's Sports Bar between 10:00 p.m. and 10:30 p.m. and stayed there for an hour and a half. While there, he conversed with three women: Tawanda Knox, Yolanda Corley, and Latasha Robinson.[3] Corley called a friend of hers, Calvin Wilson,[4] who stated he knew Robinson. Corley handed the telephone to Robinson, who briefly spoke with Wilson.

¶ 5. Knox left the bar shortly before Corley and Latasha. As Knox left she saw a man in the doorway of the bar she believed to be "Poppa," a nickname by which she knew Love. Knox lived across the street from Love and worked in a hair salon owned by Love's sister-in-law. Knox testified that she said, "What's up, Poppa?" as she exited the bar. Knox could not remember if the person said anything back to her. Upon cross-examination, Knox testified that she was not 100 percent certain that it was Love she saw.

¶ 6. After leaving the bar, Knox went to the vehicle she and her friends had arrived in and sat inside for approximately two minutes. She saw Robinson standing near his car, which was roughly three parking spaces away. Corley and Latasha then entered the car in which Knox was sitting.

¶ 7. Knox saw Robinson put his hands in the air like he was removing something from around his neck. As Latasha began to drive the vehicle away, Knox

---

[3] Latasha Robinson is not related to Glenn Robinson. For clarity, she will be referred to as "Latasha."

[4] Calvin's last name of "Wilson" was taken from a police report contained in the record.

noticed Robinson backing up with his hands facing out and she said, "Oh my god, he's getting robbed." Knox could not, however, see the face of the assailant in front of Robinson. The car then drove off without Knox observing the rest of the robbery. Knox immediately called Junior's Sports Bar from Latasha's cell phone to report the robbery. Knox agreed that at that time she thought Love was involved in the robbery.

¶ 8. While Robinson was being robbed, the send button on Latasha's cell phone was inadvertently pressed, and the telephone dialed the telephone number of Wilson. Knox, Corley, and Latasha's conversation in the car during and immediately after the robbery was recorded on Wilson's voicemail. The tape contained conflicting statements from the women regarding whether anyone saw "Poppa" and if so where. The State played this tape at trial.

¶ 9. Robinson left the bar with Mike Williams, a friend of Corley's, shortly after Knox. Williams gave Robinson Corley's number, after which Robinson approached his vehicle that was parked approximately 15 to 20 feet from the exit of the bar. Robinson noticed another vehicle parked directly in front of his car. Robinson was about to disarm the alarm on his vehicle when a man approached him from what Robinson assumed was the vehicle in front of his. The man approached with a silver handgun and told Robinson to, "Break yourself." Robinson understood this to mean that he was being robbed. Robinson handed over his keys, telephone, and wallet and tried to hand over his necklace but his assailant snatched it from his neck. Robinson backed away from the man with the gun and approached the rear of his vehicle. Another man stepped around the back of the vehicle and told Robin-

son not to run. After Robinson gave the men his earring, the two men ran to the car parked in front of Robinson's vehicle and left.

¶ 10. Robinson then went into Junior's Sports Bar where he called the police to report the robbery. When the police arrived, Robinson told them that the gunman was "around six two, 170 pounds and with a mini-afro, dark complected." Robinson described the other assailant as "around six one around the same weight 170, 180, and dark complexion." Robinson also estimated both assailants were no more than 29 or 30 years old.[5] Robinson did not identify any scars or facial hair as being present on either attacker. Robinson later testified that each man had been about an arm's length away from him and that he focused on the robbers' faces and staring at the gun. The whole incident took about two minutes.

¶ 11. Two days after the robbery, Robinson was given several photo arrays. Robinson did not identify anyone as the assailants. These arrays did not include a picture of Love or Effrim Moss, the person later charged as a co-conspirator to the robbery.

¶ 12. A few days after the robbery, Robinson was contacted by Wilson, who told Robinson that he had the recorded conversation between Knox, Latasha, and

[5] The parties also stipulated that if Officer Alex Lopez were called to testify, he would state that the descriptions of the suspects given to him by Glenn Robinson were as follows:

Suspect number 1. Black male. Six foot one inch, 170 pounds, 20 years of age, skinny, dark skinned with a mini-afro wearing unknown clothing and armed with a silver semi-automatic pistol. Suspect number 2, black male, 6 foot 2 inches, 180 pounds, 20 years of age, skinny, dark skinned and wearing unknown clothing.

Corley on his cell phone voicemail regarding the robbery. Robinson recorded the conversation on audiotape and gave it to the police.

¶ 13. One week after the robbery, Robinson was shown four photo arrays. In the third set, Robinson indicated that he was 80–85 percent sure that Love's picture was that of the gunman. Robinson agreed that the picture featured a man with lighter complexion than he remembered. Robinson later identified Love at a line-up, and, at trial, Robinson said he was 100 percent sure that his identification of Love as the gunman was correct. Robinson also identified Love at the preliminary hearing and trial.

¶ 14. At the time of the incident, Love had a long wide scar on his right cheek, short hair, and had a beard and mustache. Love's arrest detention report, which was filled out by the arresting officer, indicated that Love has medium complexion, weighed 245 pounds, and had a heavy build.[6] Love also testified he was 26 years old.

¶ 15. Love presented an alibi defense. Love testified that he was not at the bar that night and had never gone to Junior's Sports Bar. Love stated that he had been picking up his friend Rochelle Adams' mother the night of the robbery.

¶ 16. Rochelle testified that Love often accompanied her when she picked up her mother and remembered Love being with her on September 27, 1999, in particular because she had spent the whole day with him. Marilyn Adams, Rochelle's mother, testified that Love occasionally accompanied her daughter while

---

[6] Apparently, a suspect's weight is usually estimated by either what the suspect tells the arresting officer or by the officer's observations.

picking her up from work, but did not remember the night of September 27, 1999, in particular.

¶ 17. Mary Jones also testified on behalf of Love. Jones testified that on the night of the robbery she spoke with a man named "Dee" at Junior's Sports Bar, who, after seeing Robinson at a table behind them, stated that, he was going to rob Robinson. Jones testified that she left the bar shortly after Robinson and saw Robinson being robbed. Jones testified she observed Dee with what appeared to be a gun and saw Dee and another man approach Robinson from behind. At seeing this, Jones testified she ran, but saw Robinson take off a necklace. Jones said that "Dee" was a black male with dark complexion, approximately 26 to 27 years of age, five foot seven inches, 180 pounds with a medium build, and was clean-shaven.

¶ 18. Detective Scott LaFleur of the Milwaukee Police Department testified in rebuttal. He stated that Jones had many contradictions between her testimony and her statement to police. LaFleur stated that Jones told police the robbery was on a Saturday night, not the Monday night it occurred. LaFleur also noted that she told police she was so close behind Robinson upon leaving she caught the door before it shut after he passed through. The videotape surveillance of the doorway does not show anyone leaving directly behind Robinson. Jones also stated that the attackers came from behind and had a black gun while Robinson testified that they came from the front and behind and had a silver gun.

¶ 19. Love was found guilty of armed robbery as party to a crime. The jury was unable to reach a verdict on Moss, and he was later acquitted. The circuit court for Milwaukee County, Honorable Bonnie L. Gordon, sentenced Love to 44 years in prison.

¶ 20. Love's postconviction counsel filed two motions, one requesting sentencing modification, the other alleging ineffective assistance of counsel. The ineffective assistance of counsel claims stemmed from Love's trial counsel's failure to object to the prosecutor's (1) reference to the preliminary examination during the trial and closing arguments; and (2) invitation to the jurors to turn down the lights and time themselves for two minutes during their deliberations. *See State v. Love,* No. 2001AP817, unpublished slip. op., ¶ 6 (Wis. Ct. App. Dec. 11, 2001). The Milwaukee County Circuit Court, Honorable Bonnie L. Gordon, denied these motions, and the court of appeals affirmed. *Id.,* ¶ 1.

¶ 21. On May 6, 2003, Love, pro se, filed a motion for post-conviction relief under Wis. Stat. § 974.06 (2001–02)[7] requesting a new trial on two grounds. First, Love requested a new trial based on newly discovered evidence. Love included an affidavit from Christopher Hawley, who claimed to have met another inmate, Floyd Lindell Smith, Jr., while at Green Bay Correctional Institution. Hawley averred that Smith admitted to robbing Robinson and shared in-depth details regarding the incident.[8] Love also submitted a booking photograph of Smith taken one week after the Robinson robbery. Smith had been arrested for carrying a concealed weapon, and his picture is that of a male with a dark complexion, 22 years old, weighing 170 pounds with a mini-afro.

¶ 22. Second, Love also argued that his postconviction counsel was ineffective for failing to allege that his trial counsel was ineffective for failing to investigate

---

[7] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[8] The affidavit does not describe these in-depth details.

an exculpatory witness. As support, Love provided a police report that was prepared on January 7, 2000, which was three days before Love's trial was to begin, that noted that Love's mother received a telephone call from the Milwaukee County Jail on November 22, 1999. The caller identified himself as Jerees Veasley and claimed to have knowledge of who actually robbed Robinson. Love alleged in his motion that trial counsel did not attempt to contact Veasley nor investigate the claim. Love also alleged that since Robinson's identification was the sole piece of evidence linking Love to the scene, the failure to investigate this exculpatory witness, or at least a witness that inculpated another, was deficient and prejudicial.

¶ 23. On July 2, 2003, the Milwaukee County Circuit Court Honorable John Franke, denied Love's motion. With regard to Love's newly discovered evidence claim, the circuit court concluded that the Hawley affidavit was not evidence that warranted an evidentiary hearing. The circuit court determined that the affidavit "merely attributes comments to another inmate, one Floyd Lindell Smith, Jr., which, if sworn to by Mr. Smith in somewhat more detail, *might* qualify as other newly discovered evidence."[9]

¶ 24. With regard to Love's ineffective assistance of counsel claim, the circuit court concluded that Love failed to offer any evidence that counsel did not investigate the alleged telephone call his mother received from Jerees Veasley. Further, the circuit court determined that Love failed to demonstrate how any investigation would have benefited his case. The circuit court

---

[9] The bulk of the circuit court's analysis centered on Knox's subsequent recantation and whether that constituted new evidence. This argument, however, is not before us.

asked, "Who is Mr. Veasley? Did he know what he was talking about? Does he lead us to any admissible evidence helpful to the defense?" Because of these deficiencies, the circuit court denied Love's motion.

¶ 25. Love, pro se, appealed. The court of appeals summarily affirmed the circuit court's order. *State v. Love,* No. 2003AP2255, unpublished order (Wis. Ct. App. May 12, 2004). Love, pro se, petitioned this court for review. After review was granted, Love was appointed counsel.

## II

¶ 26. Our standard of review was set forth in *State v. Allen,* 2004 WI 106, ¶ 9, 274 Wis. 2d 568, 682 N.W.2d 433, as follows:

> Whether a defendant's postconviction motion alleges sufficient facts to entitle the defendant to a hearing for the relief requested is a mixed standard of review. First, we determine whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief. This is a question of law that we review de novo. [*State v.*] *Bentley,* 201 Wis. 2d [303,] 309–10 [682 N.W.2d 433 (1996)]. If the motion raises such facts, the circuit court must hold an evidentiary hearing. *Id.* at 310; *Nelson v. State,* 54 Wis. 2d 489, 497, 195 N.W.2d 629 (1972). However, if the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing. *Bentley,* 201 Wis. 2d at 310–11; *Nelson,* 54 Wis. 2d at 497–98. We require the circuit court "to form its independent judgment after a review of the record and pleadings and to support its decision by written opinion." *Nelson,* 54 Wis. 2d at 498.

*See Bentley,* 201 Wis. 2d at 318–19 (quoting the same). We review a circuit court's discretionary decisions under the deferential erroneous exercise of discretion standard. *In re the Commitment of Franklin,* 2004 WI 38, ¶ 6, 270 Wis. 2d 271, 677 N.W.2d 276; *Bentley,* 201 Wis. 2d at 311.

## III

¶ 27. In *Allen,* this court held that a postconviction motion must contain an historical basis setting forth material facts that allows the reviewing court to meaningfully assess the defendant's claims. *Id.,* ¶¶ 18, 21–22. This court contrasted mere conclusory allegations from assertions of those material facts, *id.,* ¶¶ 21, 29, which the court defined as "[a] fact that is significant or essential to the issue or matter at hand." *Id.,* ¶ 22. This court proposed that a postconviction motion will be sufficient if it alleges within the four corners of the document itself "the five 'w's' and one 'h'; that is, who, what, where, when, why, and how." *Id.,* ¶ 23. The following ineffective assistance of counsel postconviction motion hypothetical was offered as a model for presenting sufficient facts to warrant an evidentiary hearing:

> The defendant alleges she was deprived effective assistance of counsel because her trial counsel failed to call as a witness, Bill Johnson, whose testimony would support the defendant's testimony that she was dining and going to the movies with her boyfriend at 10:00 p.m. on the night of June 1, 2002, when Sally's Hair Salon was burglarized.
>
> The defendant told trial counsel that her neighbor, Bill Johnson, entered a restaurant around 7:00 p.m. while the defendant and her boyfriend were dining, and that on the way to be seated, Mr. Johnson stopped at defendant's table and talked with the couple. The defen-

dant told trial counsel that following dinner she and her boyfriend saw Mr. Johnson at the movie theater while they waited in line to buy tickets for a 9:15 p.m. movie. The defendant informed her trial counsel that three movies were scheduled to start between 9:00 p.m. and 9:15 p.m., the time during which the defendant and her boyfriend were in the theater lobby and saw Mr. Johnson. The defendant further alleges that she gave trial counsel her receipt from the restaurant.

This failure to call Mr. Johnson as a witness was deficient and prejudicial to the defendant as there is a reasonable probability that she would not have been convicted of stealing hair products from Sally's Hair Salon had Mr. Johnson testified.

*Id.,* ¶ 24.

¶ 28. This court in *Allen* indicated this showing warranted an evidentiary hearing because it "contains sufficient material facts—*i.e.,* the name of the witness (who), the reason the witness is important (why, how), and facts that can be proven (what, where, when)." *Id.*

¶ 29. Love contends his postconviction motion satisfies *Allen's* proposal that a postconviction motion allege "the five 'w's' and one 'h;' that is, who, what, where, when, why, and how." *Id.,* ¶ 23. He asserts that he has submitted material facts as opposed to conclusory allegations that would allow the reviewing court to meaningfully assess each of his claims. *See id.,* ¶ 21 (citing *Bentley,* 201 Wis. 2d at 314). Further, Love argues that he is entitled to an evidentiary hearing on both his newly discovered evidence and ineffective assistance of counsel claims. We agree.[10]

---

[10] We note that Love filed his postconviction motion pro se and while incarcerated. As this court stated in *State ex rel. Terry v. Traeger,* 60 Wis. 2d 490, 496, 211 N.W.2d 4 (1973):

¶ 30. "To prevail on an ineffective assistance of counsel claim, the defendant must show that counsel's actions or inaction constituted deficient performance and that the deficiency caused him prejudice." *State v. Brunette,* 220 Wis. 2d 431, 445, 583 N.W.2d 174 (Ct. App. 1998)(citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984)). To prove constitutional deficiency, the defendant must establish that counsel's conduct falls below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687; *State v. Thiel,* 2003 WI 111, ¶ 19, 264 Wis. 2d 571, 665 N.W.2d 305. To prove constitutional prejudice, the defendant must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Thiel,* 264 Wis. 2d 571, ¶ 20 (quoting *Strickland,* 466 U.S. at 694). The focus of the inquiry is not on the outcome of the trial, but on " 'the reliability of the proceedings.' " *Id.* (quoting *State v. Pitsch,* 124 Wis. 2d 628, 642, 369 N.W.2d 711 (1985)).

¶ 31. Regarding ineffective assistance of postconviction counsel, Love asserted the following in his postconviction motion:[11]

---

We recognize that the confinement of the prisoner and the necessary reasonable regulations of the prison, in addition to the fact that many prisoners are 'unlettered' and most are indigent, make it difficult for a prisoner to obtain legal assistance or to know and observe jurisdictional and procedural requirements in submitting his grievances to a court. Accordingly, we must follow a liberal policy in judging the sufficiency of pro se complaints filed by unlettered and indigent prisoners.

[11] The court of appeals has concluded that an ineffective

## FACTS REVIEW

The facts in support of the alleged error(s) . . . upon which this Motion is based up the follow facts herein as follows:

**1.)** On 1/7/2000 at the Home of Ms. Dorothy Love, as indicated in the supplement Report that was taken by Det. Hargrove on Pg. (3) during the interview Mrs. Love stated that on 11/22/99, she received a telephone call, from a person who identified himself **as "Jerees Veasley"** who was incarcerated at the Milwaukee County Jail. Jerees Veasley called ms. Love and stated to Ms. Love that, **"they got the wrong Man on the Glen Robinson"** case, and I know who did it. Ms. Love stated that she did mention this to Mr. Love's Attorney and that she knows about Mr. Jerees Veasley. (See. Report attached hereto as exhibit. **(B)**[12]

**2.)** Trial **counsel "Ann Bowe"** failed to investigate the facts that **"Jerees Veasley"** actually knows who robbed Mr. Glen Robinson.

**3.)** Trial counsel **"Ann Bowe"** failed to submit (Exhibit. B) into evidence and failed to interview **"Jerees Veasley"** and call him as a Witness on the behalf of the Defendant, which would have further proved that the

---

assistance of postconviction counsel claim is not barred by *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 517 N.W.2d 157 (1994). *State ex rel. Rothering v. McCaughtry*, 205 Wis. 2d 675, 556 N.W.2d 136 (Ct. App. 1996).

[12] Exhibit B to the postconviction motion was a police report dated January 7, 2000, that stated:

Also during the interview Mrs. LOVE stated that on 11/22/99, she received a telephone call, unknown time from a person who identified himself as Jerees VEASLEY, who was incarcerated at the County Jail. VEASLEY called and stated to Mrs. LOVE that "They got the wrong man on the ROBINSON case, I know who did it." Mrs. LOVE stated that she did mention this to [Love's] attorney and that they know about Mr. VEASLEY.

127

Defendant did not commit this crime. Trail counsel knew of the police report attached as (Exhibit-B.)

. . . .

## ISSUE A.1

Postconviction Counsel was Ineffective in violation of Defendant's **Sixth and Fourteenth Amendment Constitutional Rights** as guaranteed by the **Wis. and U.S. Constitution** for failing to bring a Postconviction Motion before the trial court alleging that defendant's trial counsel "**Ann Bowe**" rendered **Ineffective Assistance** for failing to Investigate and Submit evidence indicating that someone else other than the defendant had committed this crime.

. . . .

## ARGUMENT

In the case at Bar, the Defendant will prove that trial counsel rendered "**Ineffective Assistance**" in the following respects and that Postconviction Counsel was Ineffective for failing to allege the error's of the trial counsel.

As demonstrated in the facts upon which defendant's Motion is based, trial counsel was aware of the police report and statement of "**Jerees Veasley**" attached to this Motion as **(Exhibit-B-)**, which states that "**Jerees Veasley**" knows who Robbed Mr. Glen Robinson and that the Defendant was not that person and has been wrongly accused.

Trial counsel failed to investigate by contacting "**Jerees Veasley**" for purpose of calling him as a Witness on the behalf of the Defendant which would have served as exculpatory evidence in the Defendant's favor and further proved his innocence.

128

. . . .

## BUT FOR COUNSEL'S UNPROFESSIONAL ERROR'S THE RESULTS WOULD HAVE BEEN DIFFERENT

The defendant was convicted based solely on the victim's Identification testimony. There was no additional evidence linking the Defendant to the crime such as video camera, weapon's, and or fingerprints or confession, etc.

Furthermore, the victim's initial description of the assailant was extremely inconsistent with the description of the defendant. Whereas, the victim described both assailants as being "**Dark Skin Complexioned**", **170 to 180 Pounds, Skinny,.**

. . . .

However, the defendant's actual description is **6'1 and 245 Pounds and with a heavey Built, Brown Eye's and Black hair and a medimum Brown Complexion. See. Trans. 96–97: 23–25.** In addition the defendant has a very outstanding huge large scare on the "**Right**" side of his face that without question any person looking at the Defendant could not miss such an outstanding physical impression upon his face.

In addition, police reports indicate that . . . ["]**Jerees Veasley**" either witnessed the crime and/or also had knowledge of the real culprits and had trial counsel thoroughly investigated and presented such exculpatory evidence there is a reasonable likelihood that the results of the trial would have been different. Therefore the Defendant has suffered Prejudice as a result of trial counsel's failure to investigate and prepare an adequate defense. Postconviction counsel was ineffective for failing to allege these error's committed by defendant's trial counsel. (Emphasis in original.)

129

¶ 32. We conclude the motion contains material facts to meaningfully assess the merits of Love's ineffective assistance of counsel claim.

¶ 33. First, as to the "who" prong, the motion indicates the name of the key witness that was not investigated was Jerees Veasley.

¶ 34. Second, as to the "why" and "how" prongs, the motion indicates the reason the witness is important is because Veasley's exculpatory statements were critical to Love's defense, as the crux of the State's case was the reliability of Robinson's identification, an identification Love contends was mistaken. Love mentions the discrepancies between his physical characteristics and the description Robinson gave to police shortly after the incident. Love also claims that his trial counsel knew of Veasley's information, but did not investigate his assertions that he knows who committed the crime.[13] Thus, Love argues, his trial counsel was deficient and that he was prejudiced, as Veasley's statements undermine the confidence in the outcome.

¶ 35. Third, as to the "what," "where," and "when" prongs, the motion indicates that the facts that can be proven are that on January 7, 2000, Veasley called Love's mother and said that the police arrested the wrong person in the Robinson murder. That is, Veasley offered exculpatory evidence by saying Love is not the

---

[13] The State does not dispute that pursuant to the ABA Standards for Criminal Justice, trial counsel is obligated to investigate information in police reports. *See* ABA Standards for Criminal Justice, The Defense Function, § 4–4.1 (3d ed. 1993); *see also State v. Thiel*, 2003 WI 111, ¶ 37, 264 Wis. 2d 571, 665 N.W.2d 305.

perpetrator. Although the source of Veasley's information or the manner of its acquisition is not explicit, it implied that he either had personal knowledge of the real assailant or otherwise learned material information.

¶ 36. The State seizes upon this last point, arguing that because Love does not establish how Veasley claims to know what he knows, the motion is deficient. However, a movant need only provide sufficient "objective factual assertions." *See Bentley,* 201 Wis. 2d at 313; *cf. Allen,* 274 Wis. 2d 568, ¶ 30. That is, a movant need not demonstrate theories of admissibility for every factual assertion he or she seeks to introduce.[14]

¶ 37. It is clear that Love asserts that Veasley has knowledge that can exculpate Love. Whether Veasley's information is ultimately admissible, however, is not a matter to be decided from the face of the motion papers. Accepting the statements as true, which we must,[15] the question is whether there are sufficient objective material factual assertions that would entitle Love to relief.

¶ 38. The State also contends that there are no facts to support Love's contention that his trial counsel did not investigate Veasley's assertions. On the contrary, Love asserts that trial counsel failed to investigate the facts that Veasley actually knew who robbed Robinson and that it was not Love, failed to interview Veasley, and failed to call Veasley as a witness on Love's behalf. He further asserts that trial counsel was "ineffective" for failure to properly investigate and for failure

_____

[14] It is, of course, to the movant's advantage to do so.

[15] It is not proper to entertain imagination or supposition to gauge the veracity of the factual allegations. They must be accepted as true. *Compare* Prosser, J., dissenting, ¶ 84.

to introduce known exculpatory evidence. These factual allegations and legal assertions, if true, are adequate to allow the reviewing court to meaningfully assess his claim of ineffective assistance of counsel.

2

¶ 39. We further conclude that Love's postconviction motion sets forth sufficient material factual assertions that entitle him to a hearing on his ineffective assistance of counsel claim.

¶ 40. As to deficient performance, the State does not dispute that pursuant to the ABA Standards for Criminal Justice, trial counsel is obligated to investigate information in police reports. *See* ABA Standards for Criminal Justice, The Defense Function, § 4–4.1 (3d ed. 1993); *see also Thiel,* 264 Wis. 2d 571, ¶ 37.

¶ 41. As to prejudice, although the State champions the strength of its case against Love, assuming the facts in Love's motion papers to be true, our confidence in the outcome would be undermined. The only person who identified Love as the perpetrator was the victim, Robinson, but there are concerns surrounding his identification based on numerous physical irreconcilabilities. As noted above, Robinson testified that he initially told the police that the gunman was "around six two, 170 pounds and with a mini-afro, dark complected," whereas Love was estimated at 245 pounds with a heavy build and a medium complexion. Moreover, there are also inconsistencies between his testimony concerning what he told the police and his actual police statement, which indicated that the person he identified as Love was six foot one inch, 170 pounds, 20 years of age,

skinny, and dark skinned with a mini-afro. In addition to the weight, age,[16] and skin color discrepancies, Robinson failed to notice the scar on Love's face.

¶ 42. Veasley may have admissible information as to whom the real perpetrator was, however, we cannot determine how Veasley's testimony would measure against the credibility of Robinson's identifications. The general rule is that credibility determinations are resolved by live testimony. *See Honeycrest Farms, Inc. v. A.O. Smith Corp.,* 169 Wis. 2d 596, 604, 486 N.W.2d 539 (Ct. App. 1992). Assuming Veasley's testimony is true, however, that testimony would undermine our confidence in the outcome. Thus, because Love's motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief, Love is entitled to a hearing.[17]

## B

¶ 43. To prevail on a claim for newly discovered evidence, a defendant must first prove by clear and convincing evidence that "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Armstrong,* 2005 WI 119, ¶ 161,

---

[16] Love was 26 years of age.

[17] We fail to see how the cost associated with and the nature of the hearing have any bearing on Love's right and opportunity to be heard as well as his access to the courts. *Contra* Prosser, J., dissenting, ¶ 86.

283 Wis. 2d 639, 700 N.W.2d 98 (quoting *State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997)).[18]

¶ 44. If the defendant makes this showing, then "the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial." *Id.* The reasonable probability determination does not have to be established by clear and convincing evidence, as it contains its own burden of proof. A reasonable probability of a different outcome exists if "there is a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt." *McCallum,* 208 Wis. 2d at 474.

¶ 45. Regarding his newly discovered evidence claim, Love asserted the following in his motion:

---

[18] The court of appeals has determined that due process may require granting a new trial on the basis of newly discovered evidence under Wis. Stat. § 974.06 after the time for filing postverdict motions has passed. *State v. Bembeneck,* 140 Wis. 2d 248, 252, 409 N.W.2d 432 (Ct. App. 1987). Citing *Herrera v. Collins,* 506 U.S. 390, 400 (1993), the State claims that *Bembeneck* should be overruled. In *Herrera,* the Supreme Court held that a death-row defendant's claim of actual innocence based on newly discovered evidence by itself does not state a basis for federal habeas corpus relief.

We conclude that the court of appeals in *Bembeneck* properly analyzed Wisconsin's postconviction statute. It would be illogical to close the court's doors to a defendant who has newly discovered evidence, evidence that by definition creates a reasonable probability that a different verdict would be reached at a new trial. Due process and its guarantee of fundamental fairness ensure that a defendant at least have access to the courts and an opportunity to be heard where newly discovered evidence creates a reasonable probability that a different result would be reached at a new trial, as long as the newly discovered evidence meets the minimum criteria set forth above.

## FACTS REVIEW

. . . .

**6.)** . . .

On January 30th 2003, Defendant love received a Sworn Affidavit from an Inmate known as **Christopher Hawley** while incarcerated together at North Fork Correctional Facility. **Christopher Hawley** states under Oath in his affidavit that he was incarcerated at Green Bay Correctional Facility with another Inmate known by the name of: Floyd Lindell Smith Jr. and that he heard as well as conversed with this party of several occasion's about this crime and that he in fact use to "**Brag**" to the general population that it was he of whom done and committed this Robbery against Mr. Glen Robinson. See. **(Exhibit-I).**[19]

The Defendant was not aware or had prior knowledge of the facts which are stated in ... Christopher Hawley's Affidavit[] and Statement[].

---

[19] Attached as "Exhibit-I" is Hawley's affidavit, which states in relevant part:

1.) That Mr. Love's situation was brought to my attention shortly after I arrived here in North Fork Correctional Facility on: July 25th 2002.

2.) That I was placed on the same POD-Living Unit as Mr. Love which is and was A-North and that I happen to hear or Overhear Mr. Love discussing his case with one of the Inst. Inmate Para Legals at this Facility.

3.) That I was originally transferred here to NFCF from Green Bay Correctional Inst and while there and upon my arrival there and being placed and Housed in the South Cell Hall.

4.) That further after reflecting upon what was spoke upon and knowing some details about the matter from Green Bay Correctional Facility. I introduced myself to Mr. Love and formally explained what I had been personally told relative to his direct case overall while at Green Bay Correctional Inst around another Inmate and several other's of whom where present at the time.

135

The Defendant upon questioning told Det. Allen, that he had nothing to do with the Robbery which happened to the victim Mr. Glen Robinson on 9/28/99.

. . . .

## ARGUMENT FOR REVIEW

### 1.) EVIDENCE DISCOVERED AFTER TRIAL

. . . .

On **January 30th 2003** the defendant received a Sworn Affidavit from an Inmate known as Christopher Hawley, who states Under Oath that he was incarcerated at Green Bay Correctional Institution with another Inmate by the name of Floyd Lindell Smith Jr. and that on several occasion's that he and Mr. Smith discussed matters of what and how Mr. Smith has committed this crime and that Mr. Smith was very braggative of what and how he had done this crime in effect at that point and time and all of this concerning this issue of Mr. Glen Robinson being Robbed at that appointed time. See. Exhibit. (1). The dates on the above mentioned Affidavits clearly demonstrates that this evidence was discovered after the trial.

5.) Further, that a Party or Inmate by the name of Mr. FLOYD LINDELL SMITH JR. of whom was like myself at the time incarcerated at Green Bay Correctional Facility and located within the South Cell Hall and we were a few Cells away from each other.

6.) Further on several occasion's while discussing legal elements of my own Conviction and my Criminal case, myself and Mr. Smith engaged and embarked upon several conversations relative to the criminal elements of his past and as well as my own and the matter of Mr. Glen Robinson came into discussion many times.

7.) Further, Mr. Smith Jr. on several other occasion's disclosed to me indepth details concerning what and how he had done and committed this Offense and that it was just too Bad that the weight of the matter had fell upon Mr. Love in such a manner.

## 2.) DEFENDANT WAS NOT NEGLIGENT IN SEEKING SUCH EVIDENCE AND NOW MAKING COURT AWARE

. . . .

Furthermore, the Defendant was totally unaware of the fact that Mr. Floyd Lindell Smith Jr. admitted to committing this crime to Inmate Christopher Hawley. Had not . . . Inmate Christopher Hawley voluntarily came forward with such evidence, the Defendant would not be in possession of this Newly Discovered Evidence because these facts were not known to him at the time prior to his conviction of this offense.

## 3.) EVIDENCE IS MATERIAL TO THIS ISSUE

. . . [T]here is a very strong possibility that someone other than the Defendant actually done and or committed the offense. . . .

The Sworn Affidavit of Christopher Hawley is material to this issue because it further corroborates the facts that someone other than the defendant done or committed this offense and further the material issue in this case is the identification.

## 4.) THE NEWLY DISCOVERED EVIDENCE IS NOT MERELY CUMULATIVE TO EVIDENCE PRESENTED AT TRIAL.

The Newly Discovered Evidence is based on the . . . Affidavit of Mr. Christopher Hawley who Witnessed Mr. Floyd Lindell Smith Jr. confessing to him and other's that he was the party of whom committed this offense as relative to the Mr. Glen Robinson the victim of whom was Robbed at Gun point in this case at Bar and that Mr. Floyd Lindell Smith Jr. did in fact make these outstanding statements in the presence of other's as well as to Mr. Hawley directly and while they were jointly confined at Green Bay Correctional Institution.

137

This evidence was not known to the defendant at the time of his trial because such evidence was not known to the defendant prior to his conviction therefore this evidence is not merely cumulative to evidence that was presented at trial.

. . . .

### 6.) REASONABLE PROBABILITY EXIST OF DIF-FERENT RESULTS IN A NEW TRIAL

The Defendant asserts that in light of the Newly Discovered Evidence there is a reasonable probability that a different result may be produced if the Defendant is Granted a New trial.

As the record demonstrates, the only evidence linking the Defendant to the alledged crime supposedly is that the Jury relied upon in finding the Defendant guilty is the victim's identification testimony of the defendant and the testimony of Towanda Knoxs which consisted of placing the defendant at the scene of the crime.

These Newly Discovered facts combined with the fact that the victim's initial description of the assailants describing both as being **"Dark Complexion" and 170–180 Pounds is very different from the defendant actaul description wheres the defendant's actual skin tone is and would be "Medimum Complexion" and at 245 Pounds.** During the photo Array the victim wasn't a 100% sure that the Defendant was the party of whom committed this crime.

During the entire commission of the crime, the victim ststes that he was staring straight at the Barrel of the Gun. See Trans. Pg. (35), which puts into question the degree of attention the victim was able to focus on the assailants face. While staring at the Barrel of the Gun the victim stated that he saw his life flash in front of his Eye's. See. Trans. Pg. (32) and further stated that it was a very traumatic experience. See. Trans. Pg. (32).

. . . .

138

In this case at Bar the victim describing the Defendant as being **"Dark Complexion" 170–180 Pounds, althrough Defendant is Medimum complexion and 245 Pounds renders this identification unreliable** point blank. . . .

During the Photo Array the victim wasn't a 100% sure that the Defendant was the party of whom had or held a Gun on him. See. Trans. Pg. (8). . . .

The defendant **Mr. Love has an Outstanding loud Scar on the Right side of his face that would be impossible for anyone not to notice or plainly see if viewing or looking directly at him** and or even as Mr. Robinson indicate's that he was looking down the barrel of the Gun and the State nor Mr. Robinson never mentioned at any point that they noted such an outstanding mark upon the defendant's face.

The Defendant points out these identification factors to the Court which demonstrates that the identification is purely and substantially flawed, erroneous, and unreliable and in itself casts reasonable doubt and taking into consideration defendant's Newly Discovered Evidence, a reasonable probability exist that the results may have been different if the defendant is in fact duly Granted a New trial.

¶ 46. Love also submitted a booking photograph of Smith taken just one week after Robinson was robbed.[20] The photo shows that Smith is a male of darker complexion with a mini-afro. The physical description also lists Smith's weight at 165 pounds, and Smith appears to be skinny.[21]

[20] Smith's arrest apparently stemmed from carrying a concealed weapon.

[21] Love's booking photograph also depicts a person of stocky appearance.

¶ 47. We conclude that Love's motion contains sufficient material facts that allow a reviewing court to meaningfully assess his newly discovered evidence claim. First, as to the "who" prong, the motion indicates the name of the newly discovered witness is "Christopher Hawley."

¶ 48. Secondly, as to the "why" and "how" prongs, the motion indicates that the reason Hawley is important is because another person, Floyd Lindell Smith Jr., told Hawley that he committed the crime. As Love went into at great length in his motion, only one person saw the perpetrator of the robbery: Robinson. However, Robinson's depiction of the perpetrator does not necessarily align with Love's physical description, and may more accurately line up with Smith's. As noted above, Robinson initially testified that he told the police that the gunman was "around six two, 170 pounds and with a mini-afro, dark complected." Robinson gave a different description of the gunman to the police. We have already referred to the age, weight, and skin color discrepancies between Robinson's police statement and Love's physical appearance. Love avers in his motion that in a case that turned entirely on the reliability of Robinson's eyewitness identification of Love, a different result may have occurred at a trial had the evidence about Smith and his statements to Hawley been admitted at trial.

¶ 49. Third, as to the "what," "where," and "when" prongs, the motion indicates that the facts that can be proven are that while Hawley was incarcerated in the Green Bay Correctional Facility, Smith bragged on

numerous occasions to Hawley about how he committed the crime, including giving in-depth details about its commission.

¶ 50. The State argues that the Hawley affidavit is insufficient to make a valid claim for newly discovered evidence because Love has not established the admissibility of Hawley's statements.[22] Specifically, the State claims Love cannot establish Hawley's statements fit the statement against interest exception to the hearsay rule. *See* Wis. Stat. § 980.045(4); *State v. Guerard*, 2004 WI 895, ¶ 24, 273 Wis. 2d 250, 682 N.W.2d 12.[23] However, as we noted above, a movant need not demonstrate the admissibility of the facts asserted in the postconviction motion, but rather must show sufficient objective material factual assertions that, if true, would warrant the movant to relief.

2

■

¶ 51. We also conclude that Love's postconviction motion sets forth sufficient material facts that entitle him to a hearing on his newly discovered evidence

---

[22] Specifically, the State claims that Love cannot show that Smith's statements to Hawley are statements against penal interests. Wis. Stat. § 908.045(4); *State v. Guerard*, 2004 WI 85, 273 Wis. 2d 250, 682 N.W.2d 12.

[23] In *Guerard*, 273 Wis. 2d 250, ¶ 24, this court held that a statement is admissible under Wis. Stat. § 908.045(4), if:

> 1) the statement when made tended to expose the declarant to criminal liability; and 2) the statement is corroborated by evidence that is sufficient to enable a reasonable person to conclude, in light of all the facts and circumstances, that the statement could be true.

*Id.* Of course, the proponent must also establish unavailability.

claim. The State does not dispute that the evidence was discovered after conviction; that the defendant was not negligent in seeking evidence; the evidence is material to an issue in the case; and that the evidence is not merely cumulative. *See McCallum,* 208 Wis. 2d at 473.

¶ 52. The State argues that the evidence does not create a reasonable probability that a different result would be reached at trial. *See id.* The State maintains that a reasonable probability requires an outcome determinative showing. *See State v. Avery,* 213 Wis. 2d 228, 240–41, 570 N.W.2d 573 (Ct. App. 1997).

¶ 53. Love disagrees, claiming that a reasonable probability occurs where confidence in the outcome is undermined. *See McCallum,* 208 Wis. 2d at 490 (Abrahamson, C.J., concurring); *Strickland,* 466 U.S. at 694; *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Kyles v. Whitley,* 514 U.S. 419, 434 (1984).

¶ 54. We do not decide this debate here, as Love's postconviction motion meets the higher outcome determinative test. Love's postconviction motion indicates that Hawley would testify that Love was not the assailant. Hawley will testify that Smith (or if Love can get Smith to testify, then it would be Smith's testimony that he) committed this crime. Whether that testimony is ultimately admissible is not relevant for our purposes here. Whether that testimony is credible is not relevant for our purposes here. It must be accepted as true.

¶ 55. If it is true, then the evidence against Love amounts to Robinson's identification against another's assertion that Smith committed the crime. Thus, viewing the new evidence, particularly in light of the identification discrepancies, there is a reasonable probability that a jury, looking at both, would have a reasonable doubt as to Love's guilt. Therefore, Love's motion entitles him to an evidentiary hearing.

## IV

¶ 56. In sum, we conclude Love has presented sufficient material facts for a reviewing court to meaningfully assess his ineffective assistance of postconviction counsel and newly discovered evidence claims. Further, we conclude that Love is entitled to an evidentiary hearing on both claims. Although Love's motion does not allege sufficient facts that, on their face, would be admissible at the hearing, the motion papers allege sufficient material objective factual assertions that, if true, entitle him to relief. Therefore, we reverse the court of appeals' decision and remand this case to the circuit court for an evidentiary hearing.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court for further proceedings consistent with this opinion.

¶ 57. DAVID T. PROSSER, J. (*dissenting*). Preventing the conviction of an innocent person is one of the central tenets of our criminal justice system. The United States Constitution and the Wisconsin Constitution provide a panoply of rights, including the right to remain silent, the right to counsel, the right to trial by an impartial jury, and the presumption of innocence, to assure fairness to defendants and minimize error in the adjudication of guilt.

¶ 58. After a defendant's trial and appeal rights have been exhausted, however, our system must become attentive to finality,[1] and to the significant costs in time and money of never-ending challenges to the

---

[1] *See State v. Allen,* 2004 WI 106, ¶ 11, 274 Wis. 2d 568, 682 N.W.2d 433 (citing *Teague v. Lane,* 489 U.S. 288, 309 (1989); *State v. Lo,* 2003 WI 107, ¶ 75, 264 Wis. 2d 1, 665 N.W.2d 756).

defendant's conviction.[2] Public resources are limited. When resources are squandered in the rehashing of nonmeritorious claims, the risk of error and injury to future defendants increases accordingly.[3]

¶ 59. This case implicates the requirements that a defendant must satisfy after conviction before forcing a court to conduct a post-appeal evidentiary hearing. I dissent because the majority opinion significantly reduces the requirements necessary to engage the system in this manner.

FACTUAL BACKGROUND

¶ 60. On September 28, 1999, at least two robbers ambushed former Milwaukee Bucks basketball star Glenn Robinson outside Junior's Sports Bar on North Green Bay Avenue in Milwaukee. After blocking Robinson's vehicle with their car, the men confronted Robinson and held him at gunpoint until they had stolen an estimated $40,000 in valuables, including a Rolex watch and bracelet, necklace, diamond earring, keys, cell phone, cash, and wallet. Robinson testified that he was deeply shaken by the incident because he was afraid that he was going to be gunned down in a tavern parking lot.

¶ 61. Two days after the robbery, police showed Robinson several photo arrays. He did not identify anyone. One week after the robbery, however, as he was looking through a number of additional photo arrays,

---

[2] See State v. Escalona-Naranjo, 185 Wis. 2d 168, 517 N.W.2d 157 (1994).

[3] See State v. Velez, 224 Wis. 2d 1, 12, 589 N.W.2d 9 (1999) ("we conserve scarce judicial resources by eliminating unnecessary evidentiary hearings").

Robinson identified a photograph of Lisimba Love. Robinson subsequently picked Love out of a lineup and identified him again at a preliminary examination and at trial.

¶ 62. Love turned out to be the same person whom Tawanda Knox said she saw, spoke to, and received an answer from at Junior's, moments before the robbery. Knox knew Love personally because she lived across the street from him, and she worked at a hair salon where Love went to get his hair cut. Love's sister-in-law owned the salon. Love also proved to be a habitual offender who was on parole at the time of the incident for homicide by negligent use of a motor vehicle.

¶ 63. Love lived at a North 37th Street address in Milwaukee with his mother, Dorothy, and other family members. The same address was used by Love's brothers Jeffrey, Litwain, and Khalif, all of whom had extensive criminal records. At Love's sentencing hearing, Assistant District Attorney Terry Magowan commented on Love's family, observing that two of his brothers were then in prison. Magowan said:

> [T]here was a little bit of an outburst [at the time of the Love jury verdict] by one member of his family . . . Khalif Love, his younger brother . . . I myself have prosecuted Mr. Khalif Love twice for shooting cases. . . . *[I]t's a family that kind of functions on fear and intimidation.*
>
> . . . .
>
> [G]etting back to Khalif Love, the cases against him, and I know two other prosecutors in the office who have had cases against him, *they all get dismissed because witnesses don't show up.* I remember one . . . witness

was a son of a cop and the cop called me and said I'm not letting my son testify against the Loves. (Emphasis added.)

¶ 64. Addressing Love's character at sentencing, Magowan emphasized the vehicular homicide. In November 1993 Love drove through a stop sign on North 37th Street at a very high rate of speed, striking a car and killing a woman in the car. He and his passenger fled the scene. Love later claimed that he did not know that he had hit a car or injured anyone, but Love's passenger told police that he had been instructed to lie about the nature of his injuries. Magowan asserted that Love had shown no remorse for his role in the homicide.

¶ 65. These facts from the record tell us a little more about the man who is demanding an evidentiary hearing on his largely unsupported claims. It must be remembered that Love no longer enjoys the presumption of innocence.

## ANALYSIS

### I

¶ 66. There is evidence in the record that the defendant has asked people to lie for him in the past, and that he and his family function "on fear and intimidation." It should thus be no surprise that his motion to the court contains witness recantations. The majority opinion implies that a circuit court may not consider such factors in evaluating the strength of a defendant's post-conviction motion for an evidentiary hearing. I disagree.

¶ 67. In *Nelson v. State*, 54 Wis. 2d 489, 195 N.W.2d 629 (1972), the court set down a test for an evidentiary hearing to withdraw a guilty plea after

judgment and sentencing. The court discussed federal cases and summarized the law to the effect that, where a motion is made after judgment and sentencing to correct a manifest injustice, "it is within the discretion of the trial court whether or not to grant a hearing on the motion." *Id.* at 496. After quoting from *United States v. Tivis,* 302 F. Supp. 581, 583 (N.D. Tex. 1969), *id.,* the court said:

> We here determine that if a motion to withdraw a guilty plea after judgment and sentence alleges facts which, if true, would entitle the defendant to relief, the court must hold an evidentiary hearing. However, if the defendant fails to allege sufficient facts in his motion to raise a question of fact, or presents only conclusionary allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the trial court may in the exercise of its legal discretion deny the motion without a hearing. *It is incumbent upon the trial court to form its independent judgment after a review of the record and pleadings.*

*Id.* at 497–98 (emphasis added).

¶ 68. In *State v. Bentley,* 201 Wis. 2d 303, 548 N.W.2d 50 (1996), the court was asked to review a defendant's request to withdraw his guilty pleas based on the alleged ineffective assistance of his trial counsel. The court turned to *Nelson* and restated *part* of the above-quoted test. The court declared: "If the motion on its face alleges facts which would entitle the defendant to relief, the circuit court has no discretion and must hold an evidentiary hearing." 201 Wis. 2d at 310. "However, if the motion fails to allege sufficient facts, the circuit court has the discretion to deny a postconviction motion without a hearing based on any of the three factors enumerated in *Nelson.*" *Id.* at 310–11.

147

¶ 69. In retrospect, the *Bentley* case has created problems for several reasons. First, both the court of appeals[4] and this court severed an important part of the *Nelson* test, namely, "It is incumbent upon the trial court to form an independent judgment after a review of the record and pleadings. . . . " *See Nelson,* 54 Wis. 2d at 498.

¶ 70. Second, because the court eliminated the circuit court's "independent judgment," it was able to say, "[w]hether a motion alleges facts which, if true, would entitle defendant to relief is a question of law that we review de novo." *Bentley,* 201 Wis. 2d at 310. The court seemed to be impressed with Bentley's argument that a de novo standard of review was appropriate "because the circuit court is in no better position than an appellate court to determine whether the motion was legally sufficient to require a hearing . . . . [T]he de novo standard . . . is entirely consistent with this court's prior cases which have applied a de novo standard of review *when interpreting documents.*" *Id.* at 309 (summarizing Bentley's argument) (emphasis added). This formulation effectively blocks the circuit court from considering the credibility of a written claim or digging into the court record.

¶ 71. Third, the court in *Bentley* accepted the sufficiency of Bentley's assertions that his counsel's performance was deficient, but it rejected his claim that "he entered his guilty pleas *only* because he was informed" incorrectly by his attorney about parole eligibility. The court complained that Bentley "never explains how or why the difference between a minimum parole eligibility date of 11 years, 5 months and 13

[4] *See State v. Bentley,* 195 Wis. 2d 580, 587, 536 N.W.2d 202 (Ct. App. 1995).

148

years, 4 months would have affected his decision to plead guilty." *Id.* at 316–17.

¶ 72. On this third point, the *Bentley* decision is instinctively understandable. Upon reflection, however, it is not obvious why the court is able to say that Bentley's claim that he entered his guilty plea *only* because he was misinformed by his attorney, is *not* an allegation of fact which, if true, would entitle him to relief. In addition, *Bentley* does not explain how a circuit judge knows when "sufficient facts" have been pled so that the court "has no discretion and must hold an evidentiary hearing." *See Bentley,* 201 Wis. 2d at 310.

¶ 73. The manifest inconsistency in *Bentley* is that it adheres to the *Nelson* principle that a motion may be denied by a circuit court without a hearing "if the record conclusively demonstrates that the defendant is not entitled to relief" but does not explain how the court may scrutinize the record if it is supposed to make a judgment on the face of the motion. Moreover, *Bentley* strips the circuit court of any deference when the circuit court determines that an allegation is "conclusory" and needs more facts, because the sufficiency of the motion is reviewed de novo. Too often, the natural response of frustrated circuit judges will be to schedule evidentiary hearings simply to avoid being second-guessed on appeal.

¶ 74. Last term in *State v. Hampton,* 2004 WI 107, 274 Wis. 2d 379, 683 N.W.2d 14, this court made a stab at clarifying the defendant's burden in a motion for a post-conviction hearing, saying: "*Bentley*-type allegations will often depend on facts outside the record. To ask the court to examine facts outside the record in an evidentiary hearing requires a particularized motion with sufficient supporting facts to warrant the undertaking." *Id.,* ¶ 61. Then we added:

149

In *Bangert*[5]-type cases, the defendant has the initial burden of showing the basis for a hearing; but if he succeeds, the burden shifts to the state to show by clear and convincing evidence that the defendant's plea was knowingly, voluntarily, and intelligently entered.

In *Bentley*-type cases, the defendant has the burden of making a prima facie case for an evidentiary hearing, and if he succeeds, he still has the burden of proving all the elements of the alleged error, such as deficient performance and prejudice. The defendant must prove the linkage between his plea and the purported defect. The defendant's proof must add up to manifest injustice.

Consequently, the requisite specificity required for establishing a prima facie case mirrors the defendant's ultimate burden of proof.

*Id.*, ¶¶ 62–64 (internal citation omitted).

¶ 75. In a *Bentley*-type case, the defendant retains the burden of proof. Therefore, the defendant should be required to justify an evidentiary hearing by alleging what he expects to prove. He cannot stand on conclusory allegations, hoping to supplement them at the hearing, because the hearing is not intended as a fishing expedition. The defendant should plead a reasonably full statement of the facts in dispute so that both parties can prepare and litigate the real issues efficiently and the evidentiary hearing will serve as more than a discovery device.[6]

## II

¶ 76. This brings us to the present proceeding. Love's first claim is that he was denied the effective

---

[5] *State v. Bangert,* 131 Wis. 2d 246, 389 N.W.2d 12 (1986).

[6] *Velez,* 224 Wis. 2d at 12.

assistance of counsel at trial and the effective assistance of counsel on appeal. Love alleges that Ann T. Bowe, his trial attorney, was "Incompetent/Ineffective as Counsel" in part because she "failed to investigate the facts that 'Jerees Veasley' actually knows who robbed Mr. Glen Robinson." Love alleges that his appellate counsel, Mark Rosen, was ineffective for failing to point out that Love's trial attorney was ineffective with respect to investigating Veasley.

¶ 77. The Veasley matter is grounded in a police report dated January 7, 2000, several days before Love's trial. The report was prepared by Detective Charles Hargrove who wrote in part:

> On Friday, 1/7/2000, at approximately 10:53AM I, Det. HARGROVE was conducting follow-up on the above case. This follow-up consisted of interviewing alibi witnesses for [Lisimba] LOVE, B/M, DOB: 3/16/73, of 2818 N. 37th St.
>
> At the above stated date and time I, Det. HAR-GROVE, did in fact, respond to 2818 N. 37th St. Upon my arrival at that location, I met with [Lisimba] LOVE'S mother, one Dorothy LOVE . . . who resides at that location . . .
>
> . . . .
>
> Also during the interview Mrs. LOVE stated that on 11/22/99, she received a telephone call, unknown time from a person who identified himself as Jerees VEASLEY, who was incarcerated at the County Jail. VEASLEY called and stated to Mrs. LOVE that "They got the wrong man on the ROBINSON case, I know who did it." Mrs. LOVE stated that she did mention this to [Lisimba's] attorney and that they know about Mr. VEASLEY.

151

¶ 78. This police report was available before trial. Love acknowledged that he had read the police reports. Consequently, he must have known about Jerees Veasley before trial and realized that Veasley did not testify at trial. Love's conviction was appealed. He also filed a post-conviction motion challenging the effectiveness of his trial counsel.

¶ 79. Against this background, Love's second ineffective assistance of counsel claim against Ann Bowe is barred by *State v. Escalona-Naranjo,* 185 Wis. 2d 168, 517 N.W.2d 157 (1994), which holds that any claim that could have been raised on direct appeal or in a previous Wis. Stat. § 974.06 post-conviction motion is barred from being raised in a subsequent § 974.06 post-conviction motion, *absent a sufficient reason.* No "sufficient reason" has ever been shown why this claim was not raised earlier, and in my view, it is clearly barred.

¶ 80. Setting aside *Escalona,* additional facts show why Love's ineffective assistance claim should not be accepted at face value—why resort to facts in the record demonstrates that the motion is insufficient.

¶ 81. On November 22, 1999, Jerees Veasley was allegedly incarcerated at the Milwaukee County Jail. Lisimba Love was also incarcerated at that time awaiting trial. Love and Veasley may have been incarcerated in the same facility, may have crossed paths, or may have known each other previously. We are left to speculate about the relationship because Love does not explain whether the two men know each other. Logically, there must have been some reason why Jerees Veasley called Love's mother at her home instead of some person in authority.

¶ 82. Love's trial attorney, Ann Bowe, was no stranger to Love. She had represented him in the vehicular homicide case in 1993. Early on, Bowe de-

cided to pursue an alibi defense in the Robinson case, and she notified the district attorney of that strategy, naming alibi witnesses including Love's mother. At trial, Bowe produced witness Mary Jones, who attributed the robbery to someone named "Dee."

¶ 83. The quoted police report indicates that Dorothy Love advised Love's attorney about Jerees Veasley and was told "that they know about Mr. Veasley."

¶ 84. Considering the defendant's alibi defense, it is hard to imagine that Attorney Bowe would not have contacted a man claiming to know the real perpetrator. It is even harder to imagine that Love's post-conviction attorney, Mark Rosen, who unsuccessfully accused Bowe of ineffective assistance of counsel on other grounds, would not have added the ground that Bowe never interviewed Jerees Veasley if Rosen thought for a minute that Bowe never interviewed Veasley.

¶ 85. Love's lengthy motion for post-conviction relief is supplemented with several affidavits, but there is no affidavit from Jerees Veasley saying he was not interviewed by Ann Bowe, and no affidavit from Ann Bowe acknowledging that she never interviewed Jerees Veasley. Indeed, although Love testified at trial that he had read all the police reports, there is no affidavit from him stating that he discussed Veasley with Bowe, asked her whether she was pursuing that lead, or inquired why Veasley did not testify at trial. Love provides nothing except a conclusory assertion that Bowe did not investigate this potential witness.

¶ 86. Love's assertion that Ann Bowe failed to seek out and interview Jerees Veasley is so improbable that Love ought to be required to do more than make a bald assertion that his attorney was derelict. After all, at the time he made the motion, Love was in Oklahoma and would have had to be brought back to Wisconsin.

Wherever he is now, he will still have to be escorted to a Milwaukee courtroom at county expense to participate in the hearing. He will have to have an attorney, at state expense. Ann Bowe will have to be in court. Jerees Veasley will probably have to be in court. An assistant district attorney will have to prepare for the hearing and spend time in court. And the court itself will have to schedule and conduct the hearing and convene all necessary court personnel. Love will have the burden of going forward, producing evidence, and persuading the court at a hearing, and he should be required to tell the court what he expects to prove before he is given that hearing.

¶ 87. This court should insist on more detail before it affords an evidentiary hearing in response to Love's unsupported assertion that Ann Bowe did not investigate Veasley's story. It would not have been difficult for Love to obtain and submit more information. He could have written a "Dear Ann" letter, asking his former attorney to confirm that she never interviewed Veasley. Instead, he sent 26 letters asserting his innocence to everyone from the Commissioner of the National Basketball Association to the sports investigative person at the Gary Post-Tribune. He could have enlisted his mother to ask Veasley to submit a sworn affidavit revealing the alleged perpetrator of the robbery or simply asserting that he never spoke with Ann Bowe or anyone representing her. There is no indication that any of this was attempted. Thus, the majority's favorable ruling on Love's ineffective assistance of counsel claim seriously dilutes the sufficiency requirements of a post-conviction motion for an evidentiary hearing.

¶ 88. I agree with the majority's statement of the standard of review.[7] Majority op., ¶ 26 (quoting *State v. Allen,* 2004 WI 106, ¶ 9, 274 Wis. 2d 568, 682 N.W.2d 433). The *Allen* court's subsequent reference to "the five 'w's' and the one 'h;' that is, who, what, where, when, why, and how," *Allen,* 274 Wis. 2d 568, ¶ 23, was intended to assist a defendant in alleging sufficient material facts to entitle the defendant to relief.

¶ 89. It must be acknowledged, however, that statements with the five "w's" and the one "h" may not be sufficient in themselves to justify a hearing, if they are presented as statements of ultimate fact in a conclusory manner without any supporting detail.

¶ 90. To illustrate the problem, consider again the *Bentley* case in which the defendant contended that he entered guilty pleas after his counsel erroneously gave

---

[7] *Allen,* 274 Wis. 2d 568, ¶ 9, states:

Whether a defendant's postconviction motion alleges sufficient facts to entitle the defendant to a hearing for the relief requested is a mixed standard of review. First, we determine whether the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief. This is a question of law that we review de novo. [*State v. Bentley,* 201 Wis. 2d [303,] 309–10 [682 N.W.2d 433 (1996)]. If the motion raises such facts, the circuit court must hold an evidentiary hearing. *Id.* at 310; *Nelson v. State,* 54 Wis. 2d 489, 497, 195 N.W.2d 629 (1972). However, if the motion (1) does not raise facts sufficient to entitle the movant to relief, (2) or presents only conclusory allegations, or (3) if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing. *Bentley,* 201 Wis. 2d at 310–11; *Nelson,* 54 Wis. 2d at 497–98. We require the circuit court "to form its independent judgment after a review of the record and pleadings and to support its decision by written opinion." *Nelson,* 54 Wis. 2d at 498. *See Bentley,* 201 Wis. 2d at 318–19 (quoting the same). We review a circuit court's discretionary decisions under the deferential erroneous exercise of discretion standard. *In re the Commitment of Franklin,* 2004 WI 38, ¶ 6, 270 Wis. 2d 271, 677 N.W.2d 276; *Bentley,* 201 Wis. 2d at 311.

him incorrect information on his eligibility for parole. His *unsuccessful* post-conviction motion stated in part:

> 4. Defendant will testify that he entered his guilty pleas only because he was informed by his trial attorney, Alan Olshan, that the parole eligibility date for first degree intentional homicide would be 11 years and 5 months.
>
> . . . .
>
> 6. Defendant's attorney, Alan Olshan, will testify that he told defendant he would try to get parole eligibility set under the "old law," which would result in parole eligibility of 11 years, 4 months.
>
> 7. The minimum parole eligibility, if a court does not set a parole eligibility date, is approximately 13 years and 4 months. . . . Neither the court nor the parole board can adjust a parole eligibility date below the minimum of approximately 13 years and 4 months. . . .
>
> 8. Nothing in either the plea questionnaire or the plea colloquy disabused defendant of the misunderstanding of parole eligibility.

*Bentley,* 201 Wis. 2d at 315.

¶ 91. Summarizing these allegations, Attorney Olshan discussed a plea with Bentley before the plea hearing. He gave Bentley specific information about parole eligibility. Bentley claimed that Olshan told him a person convicted of first-degree intentional homicide is eligible for parole in 11 years, 5 months. If this statement were true, the information was incorrect by almost two years. Attorney Olshan admitted that he talked to Bentley but said he promised only to try to get parole eligibility in 11 years, 4 months under "old law." This, too, was incorrect because the court could not adjust parole eligibility downward from 13 years, 4 months. Bentley was misinformed by his attorney

about parole eligibility, and this allegedly influenced his pleas because Bentley asserts that he entered guilty pleas *only* because of what he was told by his attorney.

¶ 92. Under today's majority opinion, Bentley probably met the who, what, where, when, why, and how test. Certainly, he asserted what he would testify to at a hearing and what Attorney Olshan would testify to. He claimed injury from relying on specific defective information. He alleged much more than Love alleged. Why would Bentley's motion fail under today's majority opinion?

¶ 93. The majority seems oblivious to two transcendent principles: First, "[t]he nature and specificity of the required supporting facts will necessarily differ from case to case." *Bentley,* 201 Wis. 2d at 314. Second, "conclusory allegations" are not sufficient. *Allen,* 274 Wis. 2d 568, ¶ 9.

¶ 94. If we focus on Veasley as the "who" in this case, we are told nothing about him. We are told nothing about how he got his information. We are told nothing about what he would say at an evidentiary hearing at which Love would have the burden of proof. Even Dorothy Love's statement about her conversation with Veasley is unsworn hearsay.

¶ 95. If we focus on Ann Bowe as the "who," there is nothing to support the conclusion that she did not investigate Veasley except the fact that Veasley was not called as a witness. Failure to call Veasley as a witness does not support an inference that Bowe never interviewed him or didn't have a good reason not to interview him. After all, Dorothy Love admits that when she mentioned Veasley to Love's attorney, she was told "they know about Mr. Veasley." The fact that Veasley was not called as a witness may be a sign that he lacked credibility, or that his testimony would have been in

direct conflict with the testimony of Mary Jones, or that Attorney Bowe had some other strategic reason for not calling him. If Bowe already knew "about Mr. Veasley," she must have gained this information from her own investigation or because someone like Love or Veasley or the district attorney told her. The assertion that she never investigated Veasley is simply a conclusory allegation that Love has not supported with additional facts.

¶ 96. For the reasons stated, I conclude that the defendant failed to allege sufficient facts on his claim of ineffective assistance of counsel to be entitled to an evidentiary hearing as a matter of right. Without supporting facts, it is hard to believe that Ann Bowe did not investigate Veasley. In any event, without knowing what Veasley would say, there is little justification for a hearing. I further conclude that the circuit court did not erroneously exercise its discretion in denying Love's request for an evidentiary hearing.

### III

¶ 97. Love presents a second reason for the court to hold an evidentiary hearing—newly discovered evidence consisting of a sworn affidavit from Christopher Hawley, a fellow prisoner at a corrections facility in Oklahoma. Hawley swore that when he was an inmate at the Green Bay Correctional Institution, he was housed with a prisoner named Floyd Lindell Smith, Jr., who "disclosed to me [in depth] details concerning what and how he had done and committed this Offense [the Glenn Robinson robbery] and that it was just too Bad that the weight of the matter had fell upon Mr. Love in such a manner." Hawley added that he was willing to

take a polygraph test, and he invited the district attorney's office to contact him for additional information.

¶ 98. In my view, this "new" evidence is not as easy to dismiss as the Jerees Veasley statement. Although Hawley does not give *details* of what Floyd Lindell Smith, Jr. said to him, he nonetheless *swears* that a named individual confessed to committing the crime of which the defendant was convicted. Undoubtedly, Hawley could testify at a trial against Smith on the basis of Smith's admissions.

¶ 99. Nonetheless, there are some troubling elements to the newly discovered evidence. First, the affidavit does not give details of the crime, including who else was involved, who was driving, whose car they were using, and what the robbers did with the valuables. Second, the affidavit does not exclude the participation of Lisimba Love in the robbery. Third, the affidavit misspells the name of Glenn Robinson as "Glen" Robinson, in exactly the same way that Love himself routinely misspells Robinson's name. Fourth, having discussed the matter with Love, Hawley could have obtained any "in depth details" he has of the robbery from Love himself.

¶ 100. The majority opinion fails to disclose that Floyd Lindell Smith, Jr. is the cousin of Lisimba Love. This fact is part of Love's own submission. The fact that Floyd Lindell Smith, Jr. was arrested on October 6, 1999, for carrying a concealed weapon is also part of the record. Significantly, Smith told authorities that he lived at 2818 North 37th Street, Milwaukee (which is Love's own address), when he was arrested a few days after the robbery. Put bluntly, Lisimba Love was not forthright in his motion to the court because he did not acknowledge that the two men were living in the same

house at the time of the robbery, and neither the defendant nor the majority acknowledges the possibility that Floyd Lindell Smith, Jr. learned details of the robbery directly from Lisimba Love or the possibility that Smith committed the robbery with Love.

¶ 101. In my view, the circuit court should have followed up on the information in the Hawley affidavit, notwithstanding its hearsay quality. Why? In sentencing Love, Circuit Judge Bonnie Gordon broached the possibility that three people were involved in the Robinson robbery. In her interview with Milwaukee police, Mary Jones stated that "Dee" was present at Junior's Bar with *three* other men. Effrim Z. Moss, Love's co-defendant who was found not guilty of the robbery, was also a Love relative. The Robinson robbery could have been a "family" enterprise. Against this background, there is a real possibility that Floyd Lindell Smith, Jr. has actual knowledge of the robbery, whether or not he participated in it, and whether or not Love participated in it.

¶ 102. The circuit court could have issued an order to show cause to the district attorney's office, asking why an evidentiary hearing should not be held on Hawley's affidavit. This would have permitted the district attorney's office to conduct an investigation that included conversations with Hawley and Smith before a decision was made on a hearing.

¶ 103. The majority doesn't wait for such preliminaries. It orders an evidentiary hearing on the Hawley affidavit without coming to grips with what is likely to happen. How will Love meet his burden of proof at the hearing? What will happen if Smith asserts his right to remain silent? There needs to be preparatory effort before the court holds a hearing. Because the majority

160

disagrees and seriously dilutes the sufficiency require-
ments for post-conviction evidentiary hearings, I re-
spectfully dissent.

¶ 104. I am authorized to state that Justice JON
P. WILCOX joins this opinion.