COURT OF APPEALS
DECISION
DATED AND FILED

June 27, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1288-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF2280

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ARNELL DERON GILMER,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: M. JOSEPH DONALD and JANET C. PROTASIEWICZ, Judges. *Affirmed*.

Before Brash, C.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Arnell Deron Gilmer appeals the judgment convicting him of first-degree intentional homicide while using a dangerous weapon and of possessing a firearm as a felon. He also appeals the order denying his postconviction motion.[1] Gilmer argues that his trial counsel was ineffective for failing to introduce Gilmer's post-shooting comments and the victim's toxicology report. He additionally contends that he is entitled to resentencing. Gilmer's ineffective assistance of counsel claims fail because there is no reasonable probability that his trial would have ended differently had trial counsel presented the evidence at issue. We additionally conclude that he is not entitled to resentencing because the trial court properly exercised its sentencing discretion. Accordingly, we affirm.

## I. BACKGROUND

¶2 The State filed a criminal complaint and information charging Gilmer with one count of first-degree reckless homicide while using a dangerous weapon and one count of possessing a firearm as a felon. The complaint alleged that Milwaukee police officers responded to a 911 call for a shooting incident at approximately 3:00 a.m. The officers were let into the residence by sixteen-year-old H.D.B., who told them her mother had been shot.

¶3 The complaint further alleged that officers went upstairs and observed Gilmer sitting on the floor of one of the bedrooms. They asked Gilmer where the gun was, and he pointed to the bedroom closet. The officers located a revolver on the closet floor. In one of the other bedrooms, the officers observed

---

[1] The Honorable M. Joseph Donald presided over Gilmer's trial and sentencing. The Honorable Janet C. Protasiewicz presided over the postconviction proceedings.

Teneya Little on the bed with a gunshot wound to her head. She was pronounced dead at 4:19 a.m. the same day, and her death was ruled a homicide. Gilmer admitted to shooting Little.

¶4 The State subsequently filed an amended information modifying the homicide charge to first-degree intentional homicide while using a dangerous weapon. The case proceeded to a four-day jury trial. After the close of evidence, the court instructed the jury on two lesser-included offenses with respect to the homicide charge: first-degree reckless homicide and homicide by negligent handling of a dangerous weapon. The jury returned verdicts finding Gilmer guilty of first-degree intentional homicide while using a dangerous weapon and of possessing a firearm as a felon.

¶5 The trial court sentenced Gilmer on the homicide charge to life imprisonment without the possibility of release to extended supervision, plus an additional five years for the weapon enhancer. On the charge of possessing a firearm as a felon, the trial court sentenced Gilmer to five years of initial confinement and five years of extended supervision, consecutive to his life sentence.

¶6 Postconviction, Gilmer argued that trial counsel provided ineffective assistance when he failed to present evidence that immediately after the shooting, Gilmer told H.D.B., "I'm sorry … I didn't mean to … I forgot it was loaded" and when he failed to present evidence of Little's intoxication. Gilmer also sought resentencing on the ground that the sentencing court failed to adequately explain why it imposed a life sentence without the possibility of release to extended supervision.

¶7     The postconviction court held a ***Machner*** hearing before rejecting Gilmer's claims.[2]  This appeal follows.

## II. DISCUSSION

### I. *Trial counsel was not ineffective.*

¶8     Gilmer continues to argue that his trial counsel was ineffective for failing to introduce Gilmer's post-shooting comments and Little's toxicology results.  Our analysis of his claims involves the familiar two-pronged test: the defendant must show that his trial counsel's performance was deficient and that the deficiency prejudiced the defense.  ***Strickland v. Washington***, 466 U.S. 668, 687 (1984).  "To prove constitutional deficiency, the defendant must establish that counsel's conduct falls below an objective standard of reasonableness."  ***State v. Love***, 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62.  "To prove constitutional prejudice, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  ***Id.*** (citations and one set of quotation marks omitted).

¶9     Whether counsel's actions were deficient or prejudicial is a mixed question of law and fact.  ***Strickland***, 466 U.S. at 698.  The trial court's findings of fact will not be reversed unless they are clearly erroneous.  ***State v. Pitsch***, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).  However, whether counsel's conduct

---

[2] *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

The trial court did not specifically rule on Gilmer's claim for resentencing.

4

violated the defendant's right to effective assistance of counsel is a legal determination, which this court decides *de novo*. **Id.** We need not address both prongs of the test if the defendant fails to make a sufficient showing on either one. *See Strickland*, 466 U.S. at 697.

¶10 We address each of Gilmer's ineffective assistance claims in turn.

**A. Failure to introduce evidence of Gilmer's post-shooting comments.**

¶11 Gilmer's theory of defense at trial was that Little's death was the result of an accident, not intentional murder. Gilmer directs our attention to the discovery materials, which contain H.D.B.'s complete statement to police about Gilmer's comments in the immediate aftermath of the shooting:

> [H.D.B.] said that a minute or two later, [Gilmer] came running into [her] bedroom, holding a black gun in his right hand and said, "I just blew your mama's brains out … I'm sorry … I didn't mean to … I forgot it was loaded … I shouldn't have put the bullets in."

¶12 At trial, however, H.D.B. said only that Gilmer "came in saying he messed up and stuff. He F'd up." She testified that Gilmer also stated: "I blew your mama['s] brains out." Trial counsel did not cross-examine H.D.B. about the remainder of Gilmer's statements. There was no testimony from H.D.B. about Gilmer immediately stating that he was sorry, that he had forgotten that the gun was loaded, and that he did not mean to shoot Little. According to Gilmer, "[t]his was the most powerful piece of evidence available to [trial] counsel to rebut the charge that Mr. Gilmer killed Ms. Little intentionally, yet trial counsel allowed this evidence to be omitted from the trial."

¶13 In analyzing this issue, we focus on the prejudice prong. Gilmer argues there is a reasonable probability that if the jury had heard his post-shooting

comments that he did not mean to shoot Little, the result of his trial would have been different. Specifically, Gilmer asserts that there is a reasonable probability that he would have been convicted of one of the lesser-included offenses rather than first-degree intentional homicide.

¶14 According to Gilmer, his post-shooting comments qualified as an excited utterance with circumstantial guarantees of trustworthiness and would have been believed by the jury. It is Gilmer's position that the reliability of his statements immediately following the shooting could have moved the needle for the jury from first-degree intentional homicide to reckless homicide.

¶15 Gilmer makes too much of his post-shooting comments. Gilmer testified that the shooting was an accident that occurred after Little grabbed the gun and pulled it toward her. His fleeting post-shooting comments to H.D.B. that he did not mean to shoot Little, that he forgot the gun was loaded, and that he should not have put bullets in the gun were cumulative evidence of the defense's accident theory.

¶16 Moreover, even if his post-shooting comments were *more* reliable, it is still questionable whether the jury would have believed *any* statements attributable to him—including those qualifying as excited utterances. In this regard, Gilmer acknowledges that he gave multiple inconsistent versions of the events surrounding Little's death. He writes in his brief: "Mr. Gilmer's statements were already inconsistent. That ship had sailed before the trial even began." Later in his brief, Gilmer additionally relays that he "had undeniable credibility issues[.]"

¶17 In addition, Gilmer glosses over the other evidence that was presented at trial which refuted the accident theory of defense. There was

sufficient evidence showing that Gilmer shot Little in the head at close range on an evening when she was mad at him for seeing other women. Additionally, there was testimony that Gilmer prevented Little's children from immediately calling for help and went so far as to break H.D.B.'s phone in the immediate aftermath of the shooting.

¶18 Gilmer has not shown a reasonable probability that the trial outcome would have been different if trial counsel had presented his post-shooting comments in their entirety. Consequently, this claim fails on the prejudice prong.

**B. Failure to introduce Little's toxicology report.**

¶19 Next, Gilmer argues that all of his statements about how the shooting occurred involved some combination of the game of Russian Roulette and/or Little pulling on the gun, causing it to go off accidentally. He contends that "[c]ommon sense indicates that any such scenario is more plausible if Ms. Little was intoxicated," and points to the "hard evidence" of Little's intoxication. Gilmer submits that trial counsel was aware that there was a toxicology report he could obtain and either never did so or obtained it, but chose not to use it. According to Gilmer, the toxicology report would have made it more likely in the minds of the jurors that Little did, in fact, act in the emotional and reckless manner that Gilmer described, first by retrieving the firearm from her closet and then by grabbing it and trying to pull it away from Gilmer.

¶20 We conclude that the toxicology report and its attendant laboratory findings were cumulative to what the State sums up as effectively undeniable at trial: "[Little] was drunk when Gilmer shot her in the head." Gilmer testified that he and Little were both very intoxicated after a night of drinking. Despite Gilmer's credibility issues, the jury had reason to believe him on the issue of

intoxication. H.D.B. testified that Little was celebrating her upcoming birthday earlier in the day and did not return home until after midnight. The State additionally points out that it did not offer any evidence to refute Little's intoxication.

¶21 Even Gilmer acknowledges in his brief that, regardless of how the shooting transpired, "it is undisputed that it occurred during a late-night argument between Mr. Gilmer and Ms. Little, during which they were both very intoxicated." Consequently, we agree with the State's assessment that it is difficult to see any possibility—let alone a reasonable probability—that the jury would have acquitted Gilmer or found him guilty of a lesser homicide charge had it known Little's precise blood alcohol concentration. This claim also fails on the prejudice prong.

¶22 To the extent Gilmer asserts that the probability of a different outcome in this case increases when trial counsel's two omissions are viewed in the aggregate, we are not convinced. "[W]hen a court finds numerous deficiencies in a counsel's performance, it need not rely on the prejudicial effect of a single deficiency if, taken together, the deficiencies establish cumulative prejudice." *State v. Thiel*, 2003 WI 111, ¶59, 264 Wis. 2d 571, 665 N.W.2d 305. In this case, however, Gilmer has not demonstrated any prejudice arising out of the errors he alleges. Accordingly, there is no prejudice to accumulate. "Zero plus zero equals zero." *State v. Brown*, 85 Wis. 2d 341, 353, 270 N.W.2d 87 (Ct. App. 1978) (citation omitted).

## II. *Gilmer is not entitled to resentencing.*

¶23 Lastly, Gilmer argues that resentencing is warranted because the trial court failed to adequately explain why it imposed a life sentence without the

possibility of release. According to Gilmer, the trial court failed to consider a primary sentencing factor—the need to protect the public—which "in-and-of-itself constitutes an erroneous exercise of discretion in this case." Gilmer further contends that the trial court failed under *Gallion*[3] to articulate the link between the facts and factors on the one hand, and its sentencing objectives and the duration of confinement on the other.

¶24 Trial courts must explain the reasons for the particular sentence they impose, although how much explanation is necessary will vary from case to case. *Id.*, 2004 WI 42, ¶39, 270 Wis. 2d 535, 678 N.W.2d 197. A court's analysis should generally proceed as follows. The court must specify the objectives of the sentence on the record and identify the objectives of the greatest importance. *Id.*, ¶¶40-41. Sentencing objectives can include the protection of the community, punishment or rehabilitation of the defendant, and deterrence of others from committing similar offenses. *Id.*, ¶40. The court should describe the facts relevant to these objectives and explain, in light of the facts of the case, why the particular component parts of the sentence imposed advance those objectives. *Id.*, ¶42. "Courts must also identify the factors that were considered in arriving at the sentence and indicate how those factors fit the objectives and influence the decision." *Id.*, ¶43. The sentence ultimately imposed shall call for the minimum amount of custody or confinement that is consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. *Id.*, ¶44.

---

[3] *State v. Gallion*, 2004 WI 42, ¶39, 270 Wis. 2d 535, 678 N.W.2d 197.

¶25     When reviewing a court's exercise of sentencing discretion, this court starts with the presumption that the sentencing court acted reasonably. *See State v. Lechner*, 217 Wis. 2d 392, 418-19, 576 N.W.2d 912 (1998).     In determining whether an appropriate exercise of sentencing discretion occurred, this court must be able to discern from the sentencing transcript that the trial court considered the required *Gallion* factors before pronouncing sentence. *State v. Bolstad*, 2021 WI App 81, ¶26, 399 Wis. 2d 815, 967 N.W.2d 164.

¶26     Here, before pronouncing sentence, the trial court explicitly acknowledged that it had reviewed the victim impact statement provided by Little's aunt and had listened to the arguments and statements by the attorneys and Little's aunt, as well as Gilmer's allocution.  This court notes that the State's sentencing remarks stressed the need to protect the public from Gilmer's repeated possession of firearms as a convicted felon.  The trial court also observed that, in crafting Gilmer's sentence, it was required to consider the serious nature of the offenses, Gilmer's character as a defendant, and the need to protect the public.

¶27     Thereafter, the trial court recounted trial evidence that captured the severity of Gilmer's crimes, explaining, "I can't imagine being a child and hearing the gunshot in the middle of the night knowing that your mother has been shot in the head."  The trial court commented on the trauma and pain inflicted not only on Little but also on her children.  The trial court took into account "the unnecessary loss of life" and how the "game" that Gilmer played "destroyed a family." Additionally, the trial court noted Gilmer's character, which included not only his prior criminal convictions but his "distorted" view of the world and his efforts to "exercise power and control over Ms. Little."

¶28   Based on the record before it, the trial court concluded, "[t]here is nothing in this record in this [c]ourt's mind that warrants anything other than life without the possibility of parole [sic]." The trial court subsequently imposed a life sentence without the possibility of release to extended supervision on the charge of first-degree intentional homicide, with an additional five years for the penalty enhancer.[4] For possessing a firearm as a felon, the trial court imposed five years of initial confinement and five years of extended supervision to run consecutively.

¶29   We reject Gilmer's challenge to the sufficiency of the trial court's sentencing remarks. All that is required is "an explanation for the general range of the sentence imposed," *Gallion*, 270 Wis. 2d 535, ¶49, which the trial court provided. The requirement of an on-the-record explanation of the sentence imposed "is not intended to be a semantic trap for [trial] courts." *Id.* It was discernible from the sentencing transcript that the trial court considered the required factors, including the need to protect the public. *See Bolstad*, 399 Wis. 2d 815, ¶26.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[4] Gilmer recognizes that the trial court was statutorily required to impose a life sentence. *See* WIS. STAT. §§ 940.01(1)(a) & 939.50(3)(a) (2015-16). However, the trial court had discretion to make Gilmer eligible for release to extended supervision after serving twenty years or more. *See* WIS. STAT. § 973.014(1g)(a)1. (2015-16).

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.