COURT OF APPEALS
DECISION
DATED AND FILED

September 12, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1657**

Cir. Ct. No. **2006CF450**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

TRAMELL E. STARKS,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: GLENN H. YAMAHIRO, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Tramell E. Starks appeals an order denying his postconviction motion for a new trial based on newly discovered evidence without an evidentiary hearing.  As discussed below, we conclude that the circuit court properly denied Starks's motion without an evidentiary hearing and we affirm.

## BACKGROUND

¶2      This is Starks's fourth appeal before this court.  As this court has previously summarized, in 2005, police were dispatched to Lee Weddle's residence after a neighbor called 911 to report that he heard a fight followed by several gunshots.  Police arrived to find Weddle laying face down in a pool of blood, and he was pronounced dead shortly thereafter.  Law enforcement received an anonymous tip that Starks was the shooter and that Antwon Nellum, Wayne Rogers, and other unidentified people were present during the shooting.

¶3      When police first questioned Nellum, he declined to provide any information, stating that he was afraid for himself and his family's safety.  In a later interview, Nellum told police he witnessed a fight between Starks and Weddle but left because he thought Starks "was going to do something real crazy." As he was running out of the apartment, he heard four or five gunshots.  Following this interview, and three weeks after he was released from custody, Nellum was found murdered in his car.

¶4      Rogers initially denied being present when Weddle was murdered. In a subsequent interview, Rogers told police that he witnessed a physical altercation between Starks and Weddle, after which Starks shot Weddle two times. Rogers told police he heard Weddle say something to the effect of "man, you killed me," and heard three or four more shots as he was leaving the apartment.

¶5 At Starks's trial, the jury heard testimony from several witnesses, including Rogers and Carvius Williams. Both Rogers and Williams testified that they witnessed the fight between Starks and Weddle, that Weddle pulled some hair out of Starks's head, and that Starks shot Weddle. Another eyewitness, Devin Ward, testified to the physical fight between Starks and Weddle. Ward testified that he left and was walking to his car when he heard gunshots.

¶6 The jury also heard testimony from Trenton Gray, Starks's cousin. Gray testified that on the day of Weddle's murder, Starks called him "in a state of distress" and asked if "he can go to a place … up in North Dakota … to take refuge for some things that he believe[d] he had done." When Gray asked Starks what was going on, he said, "I don't know, Cuz, I think I just murdered somebody." Gray further testified that in a later conversation, Starks told him about the fight and named the person who had provided the gun. Gray also testified that Starks wanted to kill Williams who he believed "was telling on him about the murder[.]"

¶7 In addition, the jury heard testimony that hair located at the scene matched Starks's DNA to a statistical degree of certainty of one out of eighteen billion.

¶8 The jury convicted Starks of first-degree reckless homicide and possessing a firearm as a felon, and we affirmed on direct appeal. *State v. Starks*, No. 2008AP790-CR, unpublished slip op. (WI App Dec. 23, 2008) (*Starks I*).

3

¶9      On January 19, 2010, Starks filed a WIS. STAT. § 974.06 (2021-22)[1] postconviction motion, which the circuit court denied. We affirmed the circuit court's order denying relief. *State v. Starks*, No. 2010AP425, unpublished slip op. (WI App June 14, 2011) (*Starks II*). The Wisconsin Supreme Court granted review and affirmed the circuit court's order on different grounds. *State v. Starks*, 2013 WI 69, 349 Wis. 2d 274, 833 N.W.2d 146 (*Starks III*), *abrogated by State ex rel. Warren v. Meisner*, 2020 WI 55, 392 Wis. 2d 1, 944 N.W.2d 588.

¶10     On November 20, 2014, Starks filed a second WIS. STAT. § 974.06 motion. Relevant to this appeal, Starks requested a new trial based on newly discovered evidence. Specifically, Starks alleged that Gray perjured himself at trial and the State engaged in prosecutorial misconduct by suborning perjury. In support, Starks pointed to letters that Gray wrote to his son, which according to Starks contained admissions from Gray that he lied at Starks's trial. The circuit court denied Starks's motion without an evidentiary hearing, and we affirmed. *State v. Starks*, No. 2014AP2915, unpublished slip op. (WI App Apr. 27, 2016) (*Starks IV*).

¶11     On March 22, 2021, Starks filed the motion underlying this appeal. In his motion, Starks again contended that Gray perjured himself at trial. Starks argued that he had new evidence that Gray fabricated his testimony to obtain a lesser sentence on a federal charge he was facing. In support, Starks filed a 2019 affidavit from Deante Chambers.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶12     In his affidavit, Chambers swore that he had a conversation with Gray in 2006 when they both were in a federal holding cell. The affidavit states in pertinent part that:

> During the time that we were in the holding cell Gray was telling me that the Feds were threatening to bring up some more charges on him if he didn't provide them with some information on his cousin regarding a homicide. Gray stated to me that, "He didn't know anything about the incident, but that he did overhear people talking about his cousin's case, and that he was going to use what he had heard in the hopes of getting out." I told Gray that if he didn't know anything, then why would he say anything, especially in regards to his own blood. Gray said that, "[i]f [Starks] was in his shoes, he would want him to do the same thing to him, because [Starks] was burnt up anyways."

¶13     In a 2021 affidavit, Chambers further explained that he ran into Starks at the Kettle Moraine Correctional Institution around 2016 to 2017. He stated that in 2006, the time of Starks's trial, he was unwilling to go forward with the information in his 2019 affidavit because he "was in serious legal trouble with federal and state authorities and there was no way that I could cooperate with a defendant who was being prosecuted, and be a witness against the State in a criminal case."

¶14     In addition to the affidavits from Chambers, Starks also filed transcripts of two phone conversations between Gray and Starks that took place when Starks was incarcerated.[2] According to the transcripts, in the first phone call, Gray offered to give Starks money for a lawyer. Gray stated that he felt guilty because he was not doing more for Starks and that "I didn't do anything to

---

[2] Starks filed an affidavit from his daughter stating that Gray was the person on the call.

you out of matters of spite. It was … all a game." Gray stated that he tried to explain to the police that what happened was an accident, and not intentional. Gray also stated that "when I told [the police] what I thought I knew, because I wasn't there … then they was trying to come up with something else." Gray went on to say that the police played him.

¶15 In a second phone call the same day, Gray again stated that he would pay for Starks's attorney and was going to get him out of prison. Gray stated that Starks "ain't do shit" and had always been a good cousin. Gray explained that he testified against Starks because he believed Starks would be convicted with or without his testimony. Gray stated that if he knew he was going to be the one to send Starks to jail "it would have been a different story." Gray stated that when Starks's mother came and talked to him, he felt like committing suicide. Gray then repeatedly apologized and stated that he was "going to do everything I can to right this wrong." Gray stated that he owed Starks and "whatever the lawyer need me to do, I'm going to do it, even if it mean I got to go back and do some more time, I'm going to do it." Gray stated that he loved Starks and would call Starks's attorney on Monday.

¶16 In addition, Starks also submitted a 2021 affidavit from Starks's brother, Jerrell Starks. In his affidavit, Jerrell stated that he ran into Gray at a Home Depot approximately twelve to eighteen months prior to the filing of his affidavit. Gray told Jerrell that he knew what he did was wrong, "but that he would have wanted [Starks] to do the same thing to him if the shoe was on the other foot." He also said that he did what he did because Starks was "already burned on his case."

¶17   Finally, Starks contended that Gray was "a professional jailhouse snitch" and listed details from three other cases where Gray testified against someone at trial.

¶18   The State filed a motion in opposition.  The State argued that the Chambers information was not new and was known prior to trial, there was no corroboration that it was Gray on the phone calls, the phone calls did not establish that Gray was recanting his testimony, the evidence presented was cumulative, and Starks did not establish a reasonable probability that the alleged new evidence would create a reasonable doubt as to Starks's guilt.

¶19   The circuit court denied Starks's motion without an evidentiary hearing.  The court adopted and incorporated the State's response as part of its decision.  The court also specifically found that Starks was aware of the allegation that Gray told Chambers that he intended to fabricate his testimony.  The court further observed that there was no statement from Gray authenticating that he was the person on the phone calls, and the calls did not contain a direct statement from Gray that he lied in his testimony.

¶20   In addition, the circuit court found that even if the proffered evidence satisfied the newly-discovered evidence requirements, "there is no reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt about [Starks's] guilt."  The court stated that Gray's testimony was significant, but not as important as the testimony from the State's eyewitnesses.   The court acknowledged that while there were inconsistencies in their testimony, both Rogers and Williams testified consistently that Starks confronted Weddle, Starks eventually punched Weddle in the jaw, and

that Starks shot Weddle several times. The court observed that the jury had an opportunity to consider the inconsistencies in evaluating the witnesses' credibility.

¶21 Starks appeals. Additional relevant facts are referenced below.

## DISCUSSION

¶22 On appeal, Starks contends that Chambers' affidavit constitutes newly discovered evidence and requests that we reverse the circuit court's decision and remand for an evidentiary hearing.

¶23 When a postconviction motion is denied without an evidentiary hearing, we review *de novo* "whether the motion on its face alleges sufficient material and non-conclusory facts that, if true, would entitle the defendant to relief" and "whether the record conclusively demonstrates that the defendant is not entitled to relief." *State v. Jackson*, 2023 WI 3, ¶8, 405 Wis. 2d 458, 983 N.W.2d 608. "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433.

¶24 To prevail on a newly-discovered evidence claim, a defendant must show by clear and convincing evidence that: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Love*, 2005 WI 116, ¶43, 284 Wis. 2d 111, 700 N.W.2d 62 (citation omitted). If a defendant satisfies his burden on all four of these elements, the circuit court must then determine "whether a reasonable probability exists that

8

a different result would be reached in a trial." *State v. Avery*, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60 (citation omitted). "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." *Id.*

¶25     Here, the record conclusively demonstrates that Starks is not entitled to relief. *See Allen*, 274 Wis. 2d 568, ¶9. First, the information from Chambers does not satisfy the requirements for newly discovered evidence. The evidence was not discovered after Starks's conviction. *See Love*, 284 Wis. 2d 111, ¶43. Starks knew prior to trial that Chambers heard Gray say that he planned to lie about Starks's confession.

¶26     At trial, Starks's attorney specifically cross-examined Gray regarding Chambers. Gray testified that he was in lockup in the federal building with Chambers and he remembered having a discussion with Chambers. Starks's attorney then asked if Gray was going to use Starks's case to get his "ass out of jail and go home," which Gray denied. In addition, before trial, Gregory Jackson sent Starks a letter alleging that he overhead a conversation between Gray and Chambers in which Gray suggested he planned to fabricate his testimony against Starks. Thus, the record reflects that the evidence was known at the time of the trial, and therefore is not new. *See id.*

¶27     Starks argues that because Jackson did not testify at trial and invoked his right to not incriminate himself, this demonstrates that the evidence is indeed new evidence. The evidence at issue, however, is not the letter or testimony from Jackson, but the underlying allegation that Chambers heard Gray state he planned to fabricate his testimony. Based on Jackson's letter, Starks could

have elicited testimony from Chambers at his trial, but did not do so. Starks does not provide an explanation for why he did not pursue Chambers's testimony at the time of trial or allege that his trial counsel was ineffective for failing to call Chambers.

¶28 Second, there is not a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to Starks's guilt. *See Avery*, 345 Wis. 2d 407, ¶25. We agree with the State that the evidence was too great to be undermined by Chambers's testimony that Gray had planned to fabricate his testimony.

¶29 At trial, both Williams and Rogers testified that they saw Starks shoot Weddle following a physical fight. The allegation that Starks and Weddle fought was corroborated by Ward, who testified that he saw the fight and then left. In addition to the eyewitness testimony, the State presented DNA evidence that hair located at the scene matched Starks's DNA to a statistical certainty of one out of eighteen billion.

¶30 Starks suggests that Chambers's statements are "terribly consequential" because Gray's testimony was "highly incriminating." The jury, however, heard weaknesses with Gray's credibility during the trial. Gray testified that he was in federal custody facing a prison sentence of thirty years to life on a drug and gun case and he hoped to serve less time by agreeing to cooperate in Starks's case. Additionally, as stated above, on cross-examination, the jury heard Starks's attorney ask Gray about his conversation with Chambers that he was

going to use Starks's case to get his "ass out of jail and go home[.]"[3]  Nonetheless, the jury still determined that Starks shot and killed Weddle.

¶31     In addition, Starks contends that Williams's and Rogers's testimony was insufficient for the jury to find Starks guilty due to inconsistencies in their testimony, their credibility, and their "overt motives to fabricate."  Once again, however, the jury heard the weaknesses with their testimony and still determined that Starks shot and killed Weddle.[4]  *See State v. Poellinger*, 153 Wis. 2d 493, 504, 451 N.W.2d 752 (1990) (stating that "[t]he credibility of the witnesses and the weight of the evidence is for the trier of fact" (citation omitted)).

¶32     Therefore, we are not persuaded that there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to Starks's guilt.  *See Avery*, 345 Wis. 2d 407, ¶25.  Accordingly, for the reasons discussed above, the record conclusively shows that Starks is not entitled

---

[3] Later in his brief, Starks suggests that if granted a new trial, the State would not call Gray at a new trial because his testimony would be "eviscerated on multiple fronts."  Whether or not the State would call Gray, however, is speculation.

[4] We note that Starks filed an affidavit from Williams in the circuit court.  In Williams's affidavit, he stated that "I can't say with absolute certainty th[a]t [Starks] was the shooter." However, as the circuit court observed, Williams's affidavit does not recant his testimony. Williams does not allege that Starks was *not* the shooter, but only that he could not say with "absolute certainty" that Starks was the shooter.

to relief based on newly discovered evidence, and the circuit court properly denied Starks's motion without an evidentiary hearing.[5]  *See Allen*, 274 Wis. 2d 568, ¶9.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[5] The State makes a number of other arguments regarding why this court should reject Starks's newly-discovered evidence claim, including that the evidence was cumulative, there was no indicia of reliability in Chambers's statements, and that Chambers's affidavit could not have been used to impeach Gray.  However, because we conclude that the Chambers information was not new evidence because it was known prior Starks's conviction, and that there is not a reasonable probability that the new evidence would have changed the result at trial, we do not address the State's additional arguments.  *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (stating that appellate courts should decide cases on the narrowest possible grounds).